**In re IMPERIAL CREDIT INDUSTRIES, INC. SECURITIES LITIGATION.**

**No. CV 98–8842 SVW.**

United States District Court,
C.D. California,
Western Division.

Feb. 21, 2003.

Francis M. Gregorek, Francis A. Bottini, Jr., Wolf, Haldenstein, Adler, Freeman & Herz, San Diego, CA, Brian Phillip Murray, Rabin & Peckel, David A. P. Brower, Wolf, Haldenstein, Adler, Freeman & Herz, New York City, Lionel Z. Glancy, Glancy & Binkow, Los Angeles, CA, Mark Reinhardt, Reinhardt & Anderson, St. Paul, MN, John W. Jeffrey, Jeffrey & Dreher, Robert Scott Dreher, Robert S. Dreher Law Offices, San Diego, CA, for John Mortensen, on behalf of himself and all others similarly situated.

Peter K. Rosen, Christopher P. Murphy, Anthony G. Graham, Fredrick S. Levin, Mayer, Brown, Rowe & Maw, Los Angeles, CA, for H. Wayne Snavely, Kevin E. Villani, Paul B. Lasiter, Imperial Credit Industries Inc., Stephen J. Shugerman, Brad S. Plantiko.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; FINDINGS OF FACT AND CONCLUSIONS OF LAW**

WILSON, District Judge.

This matter is before the Court on the Motion for Summary Judgment (the "Mo-

tion") by Defendants Imperial Credit Industries, Inc. ("ICII"), H. Wayne Snavely ("Snavely"), Stephen J. Shugerman ("Shugerman"), Kevin E. Villani ("Villani") and Brad S. Plantiko ("Plantiko") (collectively, "Defendants"). For the reasons stated herein, the Court GRANTS Defendants' Motion SVW.

### FINDINGS OF FACT

1. This is a securities fraud class action alleging claims under Sections 10(b) and 20(a) of the 1934 Securities Exchange Act 220 15 U.S.C. §§ 78j(b) & 78t(a). [# 100].[1]

2. The plaintiff class consists of, with certain exceptions, all persons who purchased securities (including both common stock and bonds) issued by Defendant Imperial Credit Industries, Inc. ("ICII") during the period from January 27, 1998 through October 1, 1998 (the "Class Period"). [# 100, ¶¶ 1, 203].

3. Defendants are ICII, H. Wayne Snavely ("Snavely"), Stephen J. Shugerman ("Shugerman"), Kevin E. Villani ("Villani") and Brad S. Plantiko ("Plantiko"). The individual Defendants were officers and/or directors of ICII during the Class Period or portions thereof. [# 100, ¶¶ 36–39].

4. ICII was incorporated in 1986. [# 100, ¶ 42]. During the Class Period, ICII held approximately 46.9% of the common stock of Southern Pacific Funding Corporation ("SPFC"). [id. ¶¶ 2, 43; # 140,

¶ 4]. SPFC was incorporated in 1994. [# 100, ¶ 42].

5. The gravamen of Plaintiffs' claims is that ICII's public filings during the Class Period inflated the value of ICII's securities by inflating the value of its 46.9% equity interest in SPFC. During the Class Period, ICII's financial statements and SPFC's financial statements were not consolidated. [# 198 at 1–2, 5–6].

6. SPFC was a subprime residential mortgage lender located in Portland, Oregon, which filed for bankruptcy on October 1, 1998. SPFC's primary assets were "residuals", that is, slices or tranches of securitizations retained by SPFC after the sale of the subprime residential mortgage loans held by SPFC.[2] Plaintiffs claim that SPFC used incorrect and improper assumptions in valuing its residuals, the effect of which was to inflate the value of SPFC's securities, and indirectly, ICII's securities. [# 198 at 2].

7. On October 9, 1998, the security holders of SPFC brought a separate action in the District of Oregon. *See In re Southern Pacific Funding Corporation Securities Litigation,* Lead Case No. CV 98–1239–MA (Consolidated). That litigation has been settled and dismissed. That litigation will be referred to hereinafter as the "Oregon Litigation." [# 198, at 2 fn. 1].

8. This action was filed on November 2, 1998.[# 1]. Related actions were filed on

---

**1.** Except as otherwise stated, all docket references herein are to the docket in Case No. CV 98–8842 SVW.

**2.** The securitization process and the retention of residuals has been described recently by the Eighth Circuit Court of Appeals: "Green Tree rose to prominence by pioneering the securitization of manufactured housing loans, which means that it pooled large numbers of these loans and put them into a trust, which sold securities for which the loans served as collateral. The securities entitled the pur-

chaser to fixed interest and principal payments under the loans. Importantly, Green Tree did not relinquish all rights under the securitized loans; instead, it retained the right to keep a portion of the loan payments and it retained the obligation to service the loans. Green Tree's profit was therefore the spread between the interest it charged the borrowers and the interest it promised the instrument-holders, minus Green Tree's costs of servicing the loans." *Florida State Bd. of Admin. v. Green Tree Financial Corp.,* 270 F.3d 645, 648–49 (8th Cir.2001)

December 8 and 11, 1998. [Case No. CV 98–9856, # 1; Case No. CV 98–9978, # 1].

9. A fourth related action was transferred to this Court on December 29, 1998 from the United States District Court for the Eastern District of Wisconsin. [Case No. CV 98–10533, # 1]. This action contained allegations to the effect that ICII's financial statements were false and misleading because ICII overvalued its equity interests not only in SPFC, but also in Franchise Mortgage Acceptance Corp. ("FMAC"), another public company in which ICII held a substantial equity interest. [Case No. CV 98–10533, # 1, ¶¶ 35–39, 44–45, 47, 49–50, 55, 60–61, 65–68].

10. On June 21, 1999, Defendants moved to dismiss the complaints in Case Nos. CV 98–8842, CV 98–9856, CV 98–9978 and CV 98–10533. [## 21, 22].

11. On September 7, 1999, the Court issued an order granting Defendants' motions to dismiss the complaints in Case Nos. CV 98–8842, CV 98–9856, CV 98–9978 and CV 98–10533, with leave to amend. [# 35].

12. On October 4, 1999, Plaintiffs filed a consolidated amended complaint. The consolidated amended complaint did not include allegations of misrepresentations in connection with ICII's equity interest in FMAC. [# 36].

13. On February 23, 2000, the Court denied Defendants' Motion to Dismiss the Second Amended Complaint, thereby lifting the automatic stay of discovery pursuant to 15 U.S.C. § 78u–4(b)(3)(B). [# 65].

14. On April 10, 2000, the Court set this case for a Pre–Trial Conference on April 30, 2001 and a trial on May 8, 2001.

[# 75; # 73]. Pursuant to Local Rule 9.4.8,[3] the discovery cut-off date was three weeks before the Pre–Trial Conference date, unless another date was set. Since no other date was set, the discovery cut-off was April 9, 2001.

15. On August 7, 2000, the Court granted Plaintiffs' motion to certify a class consisting of, with certain exceptions, all persons who purchased securities (including both common stock and bonds) issued by ICII during the period from January 27, 1998 through October 1, 1998.[# 95].

16. On February 12, 2001, and pursuant to the stipulation of the parties, the Court granted Plaintiffs leave to file a Third Amended Complaint, in which KPMG LLP ("KPMG") was named as a defendant for the first time.[4] [# 99; # 100]. During the Class Period, KPMG was the independent auditor for both ICII and SPFC. During the Class Period, KPMG also provided certain consulting services for ICII and SPFC. [# 100, ¶¶ 49, 51].

17. On March 7, 2001, KPMG filed a motion to dismiss the Third Amended Complaint, the effect of which was to reinstate the automatic stay of discovery pursuant to 15 U.S.C. § 78u–4(b)(3)(B). [# 105].

18. During the period from February 23, 2000 through March 6, 2001, when discovery in this action was unrestricted, Plaintiffs took only three depositions. Two of these (Jennifer Scutti and Steven Eisman) were analysts with Prudential and CIBC Oppenheimer, respectively, who had issued financial reports concerning SPFC. The other was Michael Ettinger, who was

---

**3.** All references to the Local Rules are to the Local Rules of this Court in effect prior to October 1, 2001.

**4.** On August 17, 2001, the Court entered an Order granting KPMG's Motion to Dismiss

based on the statute of limitations. [# 198]. On November 1, 2001, the Court entered a Final Judgment dismissing Plaintiffs' claims against KPMG with prejudice. [# 199].

ICII's information technology person. Mr. Ettinger had no knowledge whatsoever of the substantive issues of this case. [# 121, ¶ 3].

19. During the period from February 23, 2000 through March 6, 2001, Plaintiffs failed to take the deposition of any of the individual Defendants, including Snavely, Villani, Shugerman and Plantiko. Plaintiffs did not notice depositions of Snavely, Villani and Shugerman until February 28, 2001 and did not notice the deposition of Plantiko. Those depositions were set for March 12, 14 and 16, 2001, which was after the automatic stay of discovery arising out of KPMG's motion to dismiss. [# 121, ¶ 4 & Ex. A thereto; # 105].

20. During the period from February 23, 2000 through March 6, 2001, Plaintiffs failed to take the deposition of any ICII personnel who are not defendants but may have had knowledge relevant to the issues in this case. During that same time period, Plaintiffs failed to take the deposition of any of the former officers and employees of SPFC who may have had knowledge relevant to the issues in this case. [# 121, ¶ 5].

21. During the period from February 23, 2000 through March 6, 2001, Plaintiffs failed to take the depositions of any KPMG personnel who may have had knowledge relevant to the issues in this case. [# 121, ¶ 6].

22. During the period from February 23, 2000 through March 6, 2001, Plaintiffs propounded only six interrogatories and no requests for admission to Defendants. [# 121, ¶ 8].

23. On March 8, 2001, thirty-two days before the discovery cut-off in this action, Plaintiffs served an additional 265 requests for admission and an additional 4 interrogatories upon Defendants. [# 121, ¶ 8]. This discovery was served during the pendency of the automatic stay of discovery arising out of KPMG's motion to dismiss. [# 105].

24. Plaintiffs did not file any motions to compel discovery against Defendants or KPMG.

25. On March 2, 2001, Plaintiffs served Defendants with two expert reports, one by Victor Moore, an accountant ("Moore") and the other by Michael Marek, a securities analyst ("Marek"). The report by Mr. Moore (the "Moore Report") addressed the issue of the adequacy of ICII's and SPFC's financial disclosures. The report by Mr. Marek (the "Marek Report") addressed damages. [# 138, Exs. A & B; ## 146–49, Exs. B & C].

26. The Moore Report and the Marek Report were the only expert reports submitted by Plaintiffs as part of their initial expert designations. [# 138, ¶ 5].

27. Plaintiffs did not submit an expert report by a residual modeling or residual valuation expert in their initial expert designations. Neither Moore nor Marek purports to be a residual modeling or residual valuation expert. [# 138, Exs. A & B; ## 146–49, Exs. B & C; # 121, ¶ 12; # 138, ¶ 12].

28. Instead of providing Plaintiffs' own expert opinion regarding the value of SPFC's residuals, Plaintiffs' accounting expert, Moore, relied upon excerpts from an expert report authored by Andrew Davidson ("Davidson"). [# 138, Ex. B at 16–17]. Davidson was a purported residual valuation expert for the Plaintiffs in the Oregon Litigation. [# 138, ¶ 13]. Moore's reliance on Davidson was not based on review of Davidson's entire report. Instead, Plaintiffs' counsel retrieved from the public court records of the Oregon Litigation a declaration filed by Davidson that included several pages from his expert report in the Oregon Litigation. Attached to Moore's report were these excerpts from a several hundred page report prepared by David-

son in the Oregon Litigation. [# 148, Ex. 14 to Ex. C]. Plaintiffs did not retain Davidson as an expert in this action, did not identify him as expert who would testify in this action, and there is no other basis on which Davidson could be a witness at trial in this action. Indeed, there is no evidence in the record that Davidson was even aware that Plaintiffs were using excerpts from his report in this action. Defendants did not have an opportunity to depose Davidson in this action or the Oregon Litigation.

29. The excerpts from the incomplete Davidson report, relied upon by Moore, are not a type of information reasonably relied upon by an accountant in performing an audit of the financial statements of companies like SPFC and ICII. [# 139, ¶ 7].

30. The Marek Report contained no event study or similar analysis. [# 138, Ex. A; # 146, Ex. B].

31. On March 16, 2001, following the reinstatement of the automatic stay of discovery as a result of KPMG's filing its Motion to Dismiss, Plaintiffs filed an *ex parte* application to vacate the stay of discovery and to continue the dates for the discovery cut-off, pretrial conference and trial. [# 109].

32. On April 9, 2001, Defendants moved for summary judgment on all of Plaintiffs' claims. [# 137].

33. On April 16, 2001, as part of their opposition to Defendants' Motion for Summary Judgment, Plaintiffs' requested the Court pursuant to Federal Rule of Civil Procedure 56(f) to continue the hearing on Defendants' Motion for Summary Judgment in order to allow for additional discovery. [# 154].

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331.

2. To prove their claims under § 10(b) of the 1934 Securities Exchange Act, Plaintiffs have the burden of proving "(1) a misrepresentation or omission (2) of material fact (3) made with scienter (4) on which ... plaintiff[s] justifiably relied (5) that proximately cause[d] the alleged loss." *Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir.1999) *cert. denied* 528 U.S. 1154, 120 S.Ct. 1158, 145 L.Ed.2d 1070 (2000).

3. To prove their claims under § 20(a) of the 1934 Securities Exchange Act, Plaintiffs have the burden of proving, *inter alia*, a primary violation of § 10(b). *Paracor Finance, Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir.1996)

4. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Where no such showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552.

*Material Misrepresentation or Omission*

5. Defendants are entitled to summary judgment on all of Plaintiffs' claims because, after viewing the evidence in the light most favorable to Plaintiffs and with all reasonable inferences drawn in favor of Plaintiffs, there is no legally sufficient evi-

dentiary basis for a reasonable jury to find for Plaintiffs as to the existence of a material misrepresentation or omission. On Plaintiffs' theory of the case, the pertinent misrepresentations were SPFC's inflated valuations of its residuals, the effect of which was to inflate the value of SPFC's securities, and indirectly, ICII's securities. The residuals at issue in this action are financial instruments constituting a complex collection of rights. To prevail on their theory, Plaintiffs were required to produce expert testimony demonstrating that SPFC's residuals were overvalued. However, Plaintiffs failed to designate a residual valuation expert and failed to present a report by a residual valuation expert opining that SPFC's valuation of its residuals was inflated. Plaintiffs instead presented a report by an accountant (Moore) who is not and does not purport to be a residual valuation expert. Moore's report simply referenced excerpts from an expert report authored by a purported residual valuation expert retained by the plaintiffs in the Oregon Litigation (Davidson) to the effect that SPFC's residual valuations were inflated.

■ 6. The Court concludes that such reliance by an expert upon an excerpts

from an opinion by another expert generated for the purposes of another litigation is improper and that the pertinent part of the Moore Report, referring to and relying upon Davidson's opinion as to the valuation of SPFC's residuals, is therefore inadmissible.

*First,* Federal Rules of Evidence 702 and 703 permit an expert to rely upon "facts and data". The rules do not permit an expert to rely upon excerpts from opinions developed by another expert for the purposes of litigation. The instant situation is distinguishable from a medical malpractice case, where a testifying expert relies upon medical records or a patient's chart, even when portions of those records or the patient's chart may contain opinions or hearsay. The differences are that the records and the chart, including the opinions contained therein, (1) were generated for purposes other than litigation, and (2) are properly relied upon and intended to be relied upon by experts and others in the performance of their ordinary professional duties outside of litigation. Such documents therefore bear independent indicia of reliability, unlike an opinion which is generated solely for the purposes of litigation.[5]

---

**5.** "A physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays. * * * The physician makes life-and-death decisions in reliance upon them. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes." Fed. Rule Evid. 703, *Advisory Committee Note to 1972 Proposed Rules.* In other words, facts, data and opinions of medical professionals generated in the ordinary course of discharging their professional responsibilities bear a "circumstantial guarantee of trustworthiness." Fed.R.Evid. 807 (residual hearsay exception). In contrast, there is no circumstantial guarantee of trustworthiness here. Moore relies on excerpts from an

opinion prepared entirely for litigation, not facts, data or opinions generated in the ordinary course of discharging a professional responsibility owed to SPFC. Unlike the persons who prepared valuations of SPFC's residual assets for purposes of financial reporting, Davidson had no business duty to report accurately. Moreover, Federal Rule of Evidence 703 contemplates that Moore would be able to "validate" the facts, data and opinions he relied upon during his testimony and be subject to cross-examination on them. Because Moore himself is not qualified to perform residual valuation, he cannot "validate" Davidson's opinions and, therefore, those opinions cannot be subjected to meaningful adversarial testing through cross-examination of Moore. As already noted, Davidson himself will not be a witness and therefore there

*Second,* the case law supports the conclusion that Moore's reliance upon excerpts from Davidson's opinion is improper. *See, e.g., Tokio Marine & Fire Ins. Co. v. Norfolk & Western Ry. Co.,* 1999 WL 12931 at *4 (4th Cir.1999) ("one expert may not give the opinion of another expert who does not testify"); *American Key Corp. v. Cole National Corp.,* 762 F.2d 1569, 1580 (11th Cir.1985) (" Expert opinions ordinarily cannot be based upon the opinions of others whether those opinions are in evidence or not"); *6816.5 Acres of Land etc v. United States,* 411 F.2d 834, 839–40 (10th Cir.1969) (on retrial, "the trial court must take steps to exclude any expert opinion that is predicated upon another opinion"); *Taylor v. B. Heller and Co.,* 9 Ohio Misc. 104, 364 F.2d 608, 613 (6th Cir.1966) ("expert opinion may not be based upon the opinion of others, either in evidence or not in evidence").

*Third,* under *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), this Court is required to perform a "gatekeeper" role with respect to the admission of expert testimony. Under Federal Rule of Evidence 703, an expert may only rely upon facts and data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Moore is an accountant and his opinion is properly classified as an audit opinion, since he is opining that ICII's and SPFC's financial statements during a particular time were inflated and did not comply with GAAP. However, Defendants presented evidence which was essentially unrebutted that it is unprecedented for an auditor to rely upon excerpts from an opinion given in adversarial litigation as a basis for reaching an audit opinion concerning a company's financial statements and that

will be no opportunity in this case for meaningful adversarial testing of Davidson's opin-

excerpts from such an opinion are not of a type reasonably relied upon by accountants in forming audit opinions. [# 139, ¶ 7]. Exercising its gatekeeper role under *Daubert,* the Court concludes that the Moore Report, insofar as it references and relies upon excerpts from the opinion of Davidson, should be excluded from evidence because excerpts from Davidson's opinions are not facts or data of a type reasonably relied upon by experts in the field in forming inferences or opinions upon the relevant subject.

7. Plaintiffs also argued that the conclusion that SPFC's inflated the value of its residuals could be based upon sensitivity analyses performed by Bruce Horowitz ("Horowitz"), an ICII employee. The Horowitz sensitivity analysis, however, does not cure the defects in Moore's opinion. Moore relied on Davidson, not Horowitz. Accordingly, Horowitz provides no foundation for Moore's opinion that ICII's financial statements were materially misstated. Absent such a foundation, Plaintiffs cannot establish an actionable misrepresentation. Further, Plaintiffs did not designate Horowitz as an expert and did not submit an expert report by Horowitz. Moreover, Plaintiffs made no showing either that the methodology employed by Horowitz was reliable or that Horowitz was or would have been qualified to provide an expert opinion regarding the valuation of SPFC's residuals. Nor did Plaintiffs make a showing that it would have been methodologically proper to rely upon a sensitivity analysis by Horowitz and to draw conclusions therefrom regarding residual valuations, when it does not appear that Horowitz was an expert on residual valuation. The Court concludes that reference to Horowitz's sensitivity analyses

ions.

cannot fill the gap created by Plaintiffs' failure to designate a residual valuation expert or submit an expert opinion regarding the valuation of SPFC's residuals.

*Loss Causation and Damages*

■ 8. "[I]n an action brought under Rule 10b–5 for material omissions or misstatements, the plaintiff must prove both transaction causation, that the violations in question caused the plaintiff to engage in the transaction, and loss causation, that the misrepresentations or omissions caused the harm." *McGonigle v. Combs,* 968 F.2d 810, 820 (9th Cir.1992) (quoting *Hatrock v. Edward D. Jones & Co.,* 750 F.2d 767, 773 (9th Cir.1984)). "The private plaintiff asserting claims for federal securities fraud must prove causation; namely, the causal connection between defendant's misrepresentation and plaintiff's injury. The causation requirement can be broken down into two necessary elements: actual cause, or transaction causation; and proximate cause, or loss causation. Congress recently made the loss causation requirement an explicit requirement in private federal securities fraud actions." *The Ambassador Hotel Co. v. Wei–Chuan Investment,* 189 F.3d 1017, 1027 (9th Cir. 1999). According to the Private Securities Litigation Reform Act of 1995 (the "Reform Act"), "[i]n any action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4).

■ 9. Defendants are entitled to summary judgment on all of Plaintiffs' claims because, after viewing the evidence in the light most favorable to Plaintiffs and with all reasonable inferences drawn in favor of Plaintiffs, there is no legally sufficient evidentiary basis for a reasonable jury to find for Plaintiffs as to the existence of loss causation and damages.

Plaintiffs' expert report on damages, the Marek Report, is deficient for failure to provide an "event study" or similar analysis. An event study is a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price. *RMED International, Inc. v. Sloan's Supermarkets, Inc.,* 2000 WL 310352, *6 (S.D.N.Y.2000) (citing Koslow, *Estimating Aggregate Damages in Class Action Litigation under Rule 10B,* 59 Fordham L.Rev. 811, 822 & n. 50 (1991)). The event study method is "an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation." *In re Gaming Lottery Sec. Litig.,* 2000 WL 193125, *1 (S.D.N.Y.2000) (citing Fama et al., *The Adjustment of Stock Prices to New Information,* 10 Int'l Econ. Rev. 1 (1969), Mitchell et al., *The Role of Efficient Markets Hypothesis in Insider Trading and Other Securities Fraud Cases at the Securities and Exchange Commission,* 49 The Business Lawyer (1994) and Tobak et al., *Materiality and Magnitude: Event Studies in the Courtroom,* NERA Working Paper, April 1999).

■ 10. Damages in a securities fraud case are measured by the difference between the price at which a stock sold and the price at which the stock would have sold absent the alleged misrepresentations or omissions. *Affiliated Ute Citizens of the State of Utah v. United States,* 406 U.S. 128, 154–55, 92 S.Ct. 1456, 1472–73, 31 L.Ed.2d 741 (1972); *Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1341–46 (9th Cir.1976) (Sneed, J., concurring); *In re Executive Telecard Ltd. Sec. Litig.,* 979 F.Supp. 1021, 1025 (S.D.N.Y.1997). A proper measure of damages in the securities context thus requires elimination of that portion of the price decline or price difference which is unrelated to the alleged

wrong. *Green*, 541 F.2d at 1342; *Executive Telecard*, 979 F.Supp. at 1025.

11. Because of the need "to distinguish between the fraud-related and non-fraud related influences of the stock's price behavior," *In re Oracle Sec. Litig.*, 829 F.Supp. 1176, 1181 (N.D.Cal.1993), a number of courts have rejected or refused to admit into evidence damages reports or testimony by damages experts in securities cases which fail to include event studies or something similar. *See, e.g., In re Northern Telecom Sec. Litig.*, 116 F.Supp.2d 446, 460 (S.D.N.Y.2000) ("Torkelson's testimony is fatally deficient in that he did not perform an event study or similar analysis to remove the effects on stock price of market and industry information and he did not challenge the event study performed by defendants' expert."); *Executive Telecard*, 979 F.Supp. at 1024–26 (finding an expert's methodology not reliable because he failed to conduct an event study or regression analysis to detect whether stock price declines were the result of forces other than the alleged fraud; applying *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) to exclude the expert damages report); *Oracle*, 829 F.Supp. at 1181 ("Use of an event study or similar analysis is necessary more accurately to isolate the influences of information specific to Oracle which defendant allegedly have distorted.... As a result of his failure to employ such a study, the results reached by [plaintiffs' expert]. cannot be evaluated by standard measures of statistical significance.")

12. The importance and centrality of the event study methodology in determining damages in securities cases—and the propriety of rejecting expert damages reports which do not use such a methodology—has been conceded by plaintiffs in other securities fraud cases:

"[A]ccording to [plaintiffs], the methodology—'event study methodology'—used to calculate shareholder damages during the class period 'has been used by financial economists since 1969 as a tool to measure the effect on market prices from all types of new information relevant to a company's equity valuation.' .... It is so accepted, plaintiffs add, that courts now reject expert damage estimates which do not use event study methodology to evaluate the impact on the market of a company's disclosures."

*In re Cendant Corp. Sec. Litig.*, 109 F.Supp.2d 235, 253–54 (D.N.J.2000). Event studies have been submitted by experts designated by plaintiffs as well as by defendants. *See, e.g., Cendant*, 109 F.Supp.2d at 254 (referencing "[t]he event study methodology used by Lead Plaintiffs"); *Gaming Lottery*, 2000 WL 193125 at *1 (plaintiffs' expert's "analysis was based on the event study method").

13. It is undisputed that the Marek Report does not contain an event study or similar analysis. The Marek Report provides no basis "to distinguish between the fraud-related and non-fraud related influences of [ICII's] stock's price behavior," *Oracle*, 829 F.Supp. at 1181. For example, Plaintiffs initially alleged that ICII's stock price was artificially inflated as a result of material misrepresentations concerning FMAC. Although Plaintiffs dropped these assertions as part of their consolidated pleadings, they now need to differentiate between FMAC-related effects on ICII's stock price, which are not actionable, and SPFC-related effects on ICII's stock price, which may or may not be actionable. Absent an event study or similar analysis, Plaintiffs cannot draw this distinction.

14. For other examples, the Court takes judicial notice of the fact that there were other events at the pertinent time— the third and fourth quarters of 1998— which might have influenced the drop in stock prices of ICII and/or SPFC, specifi-

cally, the Russian default, the Asian crisis and the Long Term Capital default, and that these external events resulted in dramatic changes in interest rates, thereby affecting participants in the credit industry, such as ICII and SPFC. These are market events for which Defendants cannot be held responsible. However, absent an event study or similar analysis, Plaintiffs. cannot eliminate that portion of the price decline of ICII's and/or SPFC's stock which is unrelated to the alleged wrong. *Green,* 541 F.2d at 1342; *Executive Telecard,* 979 F.Supp. at 1025.

15. The Court therefore excludes the Marek Report pursuant to *Daubert* and Federal Rule of Evidence 702, on the ground that its methodology is flawed and the Court cannot conclude that the Marek Report rests on a "reliable basis in the knowledge and experience of [Marek's]. discipline." *Daubert,* 509 U.S. at 592, 113 S.Ct. at 2796; *Executive Telecard,* 979 F.Supp. at 1026.

16. In the briefing on summary judgment, Plaintiffs raised two arguments against the exclusion of the Marek Report on the basis that it failed to provide an event study or similar analysis. Plaintiffs' first argument was that an event study was unnecessary because the true value of SPFC's stock during the Class Period was zero and that the damages to ICII's shareholders could be determined based upon the difference between the true value and the stated value of ICII's equity interest in SPFC. The Court rejects this argument for the following reasons.

*First,* Plaintiffs provide no authorities or precedents to support the conclusion that the above approach is a reliable methodology or an adequate replacement or substitute for the event study methodology approved by the case law and the expert literature.

*Second,* Plaintiffs' assertion that SPFC's stock had zero value during the Class Peri-

od is based on the Moore Report and specifically Moore's reliance upon Davidson's residual modeling and residual valuation of SPFC's residuals. As discussed above, the Court concludes that it is improper to base expert opinions in this matter on excerpts from Davidson's report and opinions developed for. the plaintiffs in the Oregon Litigation.

17. *Third,* even if Marek could properly assume that SPFC's stock had zero value during the Class Period, the question would still arise as to the extent to which the difference between the true value and the market value of SPFC's stock during the Class Period was fraud-related or non-fraud related. By failing to provide an event study or similar analysis, Plaintiffs cannot carry their burden of proof on this issue.

*Denial of Plaintiffs' Rule 56(f) Request*

18. Plaintiffs requested the Court to continue the hearing on Defendants' summary judgment motion pursuant to Federal Rule of Civil Procedure 56(f) in order to allow Plaintiffs to take additional discovery. [# 154]. The Court has discretion to continue a summary judgment motion if the opposing party needs to discover essential facts. *California Union Ins. Co. v. American Diversified Savings Bank,* 914 F.2d 1271, 1278 (9th Cir.1990). The Court DENIES Plaintiffs' Rule 56(f) request on three grounds.

19. First, the undisputed record in this action shows that Plaintiffs have failed to diligently pursue discovery. Where the party opposing summary judgment has failed to diligently pursue discovery, it is proper to deny a Rule 56(f) request. *California Union,* 914 F.2d at 1278; *Mackey v. Pioneer National Bank,* 867 F.2d 520, 524 (9th Cir.1989).

20. Second, Plaintiffs have failed to show how the information which they

anticipate eliciting by the requested additional discovery would preclude summary judgment on the grounds on which Defendants have moved for summary judgment. For example, Plaintiffs do not show how any of the requested discovery would remedy any of the defects in Plaintiffs' expert reports, discussed above. Where the party opposing summary judgment fails to show how the information sought would preclude summary judgment, it is proper for the Court to deny the opposing party's Rule 56(f) request. *California Union*, 914 F.2d at 1278; *Hall v. State of Hawaii*, 791 F.2d 759, 761 (9th Cir.1986).

■ 21. Third, the Court notes that Defendants' summary judgment motion was set for hearing on April 30, 2000, three weeks *after* the discovery cut-off in this action. To grant Plaintiffs' Rule 56(f) request would thus require the Court to extend the discovery cut-off in this action and thus modify the scheduling order entered in this action. A scheduling order may be modified only upon a showing of good cause. Federal Rule of Civil Procedure 16(b). The focus of the "good cause" analysis under Rule 16(b) is the diligence of the party seeking the modification. *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir.1992) ("Rule 16(b)' s 'good cause' standard primarily considers the diligence of the party seeking the amendment.") The district court may modify the pretrial schedule "if it cannot reasonably be met despite the diligence of the party seeking the extension." Federal Rule of Civil Procedure 16 Advisory Committee's notes (1983 amendment). The Court holds that, based on the undisputed evidence of Plaintiffs' failure to diligently pursue discovery in this action, Plaintiffs have not made and cannot make the requisite showing of good cause to amend the scheduling order and extend the discovery cut-off in this action. *Zivkovic v. Southern California Edison Co.*, 302 F.3d 1080, 1087–88 (9th Cir.2002); *John-*

*son*, 975 F.2d at 609 ("If that party was not diligent, the inquiry should end").

22. After KPMG filed its Motion to Dismiss, Plaintiffs filed an *ex parte* application to vacate the stay of discovery and to continue the dates for the discovery cut-off, pretrial conference and trial. The Court understands and appreciates the difficulties faced by Plaintiffs as a result of the reinstatement of the automatic stay of discovery. However, those difficulties do not excuse Plaintiffs' failure to diligently pursue discovery during the more than one year—February 23, 2000 through March 6, 2001—when discovery was not stayed. Because Plaintiffs have failed to pursue discovery diligently, and therefore cannot make the requisite showing of "good cause" under Federal Rule of Civil Procedure 16(b), the Court DENIES Plaintiffs' *ex parte* application to vacate the stay of discovery and continue the dates for the discovery cut-off, pretrial conference and trial.

### CONCLUSION

The Court therefore GRANTS Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 on the grounds that Plaintiffs will be unable to carry their burden of proof at trial on the elements of material misrepresentation or omission, causation and damages. The Court DENIES Plaintiffs' Motion pursuant to Federal Rule Of Civil Procedure 56(f) and DENIES Plaintiffs' *ex parte* application to vacate the stay of discovery and continue the dates for the discovery cut-off, pretrial conference and trial.

IT IS SO ORDERED.